955 So.2d 864 (2006)
Tyler EDMONDS, Appellant,
v.
STATE of Mississippi, Appellee.
No. 2004-KA-02081-COA.
Court of Appeals of Mississippi.
April 25, 2006.
*867 Jim Waide, Tupelo, Robert B. McDuff, Jackson, Carlton W. Reeves, attorneys for appellant.
Office of the Attorney General by W. Daniel Hinchcliff, attorney For Appellee.
EN BANC.

MODIFIED OPINION ON MOTION FOR REHEARING
IRVING, J., for the Court.
ś 1. The motion for rehearing is denied. However, the original opinion is withdrawn and this opinion is substituted.
ś 2. Tyler Wayne Edmonds was convicted in the Circuit Court of Oktibbeha of the murder of Joey Fulgham, his half-sister's husband and sentenced to life in the custody of the Mississippi Department of Corrections. Edmonds was thirteen at the time of the offense.[1]
ś 3. On appeal, he raises the following assignments of error, which we cite verbatim:
I. IN LIGHT OF THE UNUSUAL CIRCUMSTANCES IN THIS CASE, INCLUDING EDMONDS'S AGE, THE REMOVAL OF HIS MOTHER FROM THE ROOM DURING INTERROGATION, THE USE OF HIS HALF-SISTER TO PRESSURE HIM, AND THE OBJECTIVE FACTS INDICATING THAT THE CONFESSION IS FALSE, EDMONDS'S CONFESSION SHOULD BE HELD INVOLUNTARY, UNRELIABLE, AND INADMISSIBLE.
II. EDMONDS SHOULD HAVE BEEN ALLOWED TO PRESENT AN EXPERT TO TESTIFY ABOUT *868 FALSE CONFESSIONS AND THE CONDITIONS UNDER WHICH THEY OCCURRED.
III. NO SHOWING BY THE PROSECUTION OR FINDING BY THE TRIAL COURT WAS MADE TO SUPPORT THE RELIABILITY OF THE PREVIOUSLY UNDISCLOSED OPINION OF THE STATE'S EXPERT PATHOLOGIST THAT TWO PEOPLE SIMULTANEOUSLY PULLED THE TRIGGER THAT CAUSED THE DEATH IN THIS CASE, AND THE OPINION IS SO UNSUPPORTED BY ANY SCIENTIFIC METHODOLOGY AS TO BE INADMISSIBLE UNDER DAUBERT V. MERRELL DOW AND MISSISSIPPI TRANSPORTATION COMMISSION V. MCLEMORE.
IV. THE FAILURE TO DISCLOSE DR. HAYNE'S TWO-SHOOTER ONE-GUN THEORY REQUIRES REVERSAL UNDER THE CIRCUMSTANCES OF THIS CASE.
V. THE TRIAL COURT ERRED IN EXCLUDING THE STATEMENT TO POLICE OF A WITNESS, WHO LATER DIED BEFORE THE TRIAL, THAT WOULD HAVE CORROBORATED THE DEFENDANT'S RECANTATION.
VI. COUNSEL SHOULD NOT HAVE BEEN PROHIBITED FROM FULLY PRESENTING THEIR DEFENSE THAT KRISTI FULGHAM, ACTING WITHOUT EDMONDS, KILLED JOEY FULGHAM, AND PROHIBITED FROM PRESENTING TESTIMONY THAT SHE ASKED HER FATHER FOR A GUN TO KILL HIM AND THAT SHE AND JOEY HAD A VIOLENT AND TUMULTUOUS RELATIONSHIP.
VII. POTENTIAL JURORS WHO WERE QUALIFIED TO SERVE WERE WRONGLY EXCLUDED FOR CAUSE.
VIII. SINCE THE JURORS WERE INFORMED BY THE TRIAL JUDGE THAT EDMONDS COULD NOT GET THE DEATH PENALTY BECAUSE OF HIS AGE, THEY ALSO SHOULD HAVE BEEN INFORMED THAT HE OTHERWISE WOULD BE SENTENCED LIKE AN ADULT AND WOULD RECEIVE AN AUTOMATIC LIFE SENTENCE IF CONVICTED.
IX. THE TRIAL COURT ABUSED ITS DISCRETION IN NOT TRANSFERRING THIS CASE TO YOUTH COURT.
X. THE AUTOMATIC LIFE SENTENCE IMPOSED UPON EDMONDS FOR AN OFFENSE WHEN HE WAS THIRTEEN YEARS OLD IS UNCONSTITUTIONAL IN THAT IT FAILS TO TAKE INTO ACCOUNT THE INDIVIDUAL CIRCUMSTANCES OF THE CASE OR MITIGATING FACTORS.
XI. THE TRIAL COURT ERRED IN REFUSING TO INSTRUCT THE JURY THAT CONFESSIONS BY JUVENILES SHOULD BE CONSIDERED WITH CAUTION.
XII. THE TRIAL COURT DENIED EDMONDS HIS RIGHT TO EFFECTIVE REPRESENTATIVE BY COUNSEL AND RIGHT TO INTRODUCE EVIDENCE IN HIS OWN BEHALF BY REFUSING TO ALLOW THE DEFENSE TO PRODUCE EVIDENCE THAT EDMONDS HAD RETRACTED HIS CONFESSION.
XIII. THE COURT DENIED EDMONDS'S RIGHT TO PUBLIC TRIAL *869 AND DENIED THE PUBLIC AND PRESS THEIR FIRST AMENDMENT RIGHTS WHEN THE SUPPRESSION HEARING WAS CLOSED.
XIV. A COMBINATION OF THE RULINGS OF THE COURT DENIED EDMONDS A FAIR TRIAL.
ś 4. We find no error; therefore, we affirm Edmond's conviction and sentence.

FACTS
ś 5. On Friday, May 9, 2003, Kristi Fulgham picked up her half-brother, Tyler Edmonds, to take him to her home in the Longview community as she did every other weekend. She and Edmonds have the same father, Danny Edmonds.
ś 6. According to Edmonds's videotaped confession, after arriving at Kristi and Joey's home, Edmonds and Kristi went out for Subway sandwiches for dinner. After dinner, Joey went to bed, while Kristi stayed up and used the computer. Edmonds fell asleep on the floor next to Kristi, and during the night, she woke him up and put him in one of her children's beds.
ś 7. Between three-thirty and four o'clock the alarm clock went off, waking Edmonds. He then went into the bedroom where Joey slept and, with Kristi's help, shot Joey in the back of the head with a .22 caliber rifle that Edmonds had brought with him at Kristi's request.
ś 8. Kristi and Edmonds then loaded her three children into the car and took the computer and her jewelry, which, according to Edmonds, was to make it look as if there had been a robbery. Edmonds said he also thought Kristi took Joey's wallet. They then traveled to Jackson. The gun was never found.
ś 9. The group went to Jackson to pick up Kristi's boyfriend, Kyle Harvey, and then went to the Mississippi Gulf Coast. They stayed at the Beau Rivage and played on the beach. On Sunday, Edmonds called his mother and wished her a happy Mother's Day. On their way back to Jackson, Kristi received several cell phone calls telling her that Joey had been murdered.
ś 10. Edmonds and his mother voluntarily went to the police station in Oktibbeha County on Monday evening around 6:20 p.m., after learning that the police were interested in questioning him about the murder. In his initial interview, Edmonds claimed not to know anything about what happened. Both he and his mother signed a Miranda statement and agreed to the questioning. Edmonds's mother was then taken out of the room, and Edmonds was told that Kristi had implicated him in the killing. Apparently, Edmonds did not believe the authorities. Consequently, they asked Kristi if she had a problem with telling Edmonds what she had told them. She agreed to do so. Edmonds was taken to the room where Kristi was waiting. He sat down in the chair next to her, and she told him to hold her hand. He complied, and Kristi told him "something to the effect of it's okay. I told the truth. You can tell the truth." The entire visit with Kristi lasted approximately twenty to thirty seconds. At that point, the authorities took Edmonds in the next room where he gave a videotaped confession in which he stated that he and Kristi had killed Joey.
ś 11. We quote liberally and emphasize portions of the interview in which the confession occurred:
BY OFFICER JAMES LINDSEY:
Q. Okay. We're going to â we going to talk to you about the murder case of Joey Fulgham and we want you to, uh, tell us what you know and give us a statement and this is on May *870 the twelfth, two thousand and three, and Officer Shannon Williams will, uh â will advise you of your rights and, uh â he's going to be writing the statement up. Okay?
A. Yes, sir.
BY OFFICER WILLIAMS: All right, Tyler. I'm going to go ahead and give you your rights first. Before we ask any questions you must understand your rights. You have the right to remain silent. Anything you say can be used against you in court. You have the right to talk to a lawyer for advice before we ask you any questions and have him with you during questioning. If you cannot afford a lawyer one will be appointed for you before any questioning if you wish. If you decide to answer questions now without a lawyer present you will still have the right to stop answering at anytime. You also have the right to stop answering at anytime until you talk to a lawyer. Do you understand?
A. Yes, sir.
* * *
BY OFFICER WILLIAMS: I need you to read this and sign it here.
(THE DEFENDANT READ AND SIGNED SAME)
* * *
BY OFFICER LINDSEY: We want you to understand, Tyler, this is very important, that you â that, uh, you give us this statement, and that you're telling the truth and, uh â and we want you to tell it just like it happened. Okay. Okay?
A. Yes, sir.
BY OFFICER LINDSEY: Now you're going to have to speak up where we can understand you.
EXAMINATION BY OFFICER WILLIAMS:
Q. All right. What I need you to so [sic] is let me let you start. You need to start two days from when this happened or a day, whenever you think you need to start. Okay?
A. Okay, Well Friday, I don't know the date, but â 
Q. What was Friday?
A. The tenth, I guess.
* * *
A. We went â I came home cause I didn't go to school Friday.
Q. Who is we?
A. I was home alone.
Q. Okay.
A. And Christy[2] was in Jackson and she was supposed to pick me up from school Thursday because I didn't have to go to school Friday for the field day, and she didn't come and she called me and asked me cause, you know, she'd been talking about doing it for awhile because of the way â 

Q. Doing what?

A. Killing Joey because â well she kept talking about it. I didn't actually think she was serious, and â 
Q. This is on May the tenth when y'all were talking about this?
A. Yes, sir.
Q. Okay. Were y'all taking by phone?
A. Uh, not [sic] â well she had called me about the gun and I just told her that I had a gun, but because *871 it was a old gun in the fire and was bent or broke or something and it didn't â it wouldn't shoot so I got that just to say that I could try so she'd, you know, stop asking me about it and so it wouldn't work because â 
Q. And y'all planning this, this was on Friday, May tenth, when y'all was â 
A. Yes, sir. And she came and picked me up and I took that old gun and I think it was like four or five bullets.

Q. Where'd you get the gun?
A. It was â it came from my house, but it was like somebody on my stepdad's side. I think it was his â his grandpa's old gun or something.
Q. What's your stepdad's name?
A. Craig Clay.
Q. Okay.
A. And it didn't work so I had just got it and we went over to her house and she was happy, and, you know, she had â 
Q. What day was this?
A. Friday.
Q. This was still Friday. Okay.
A. And we went over to her house and the gun was in the trunk, and, uh, when we went to her house we waited for Joey to get home and, you know, she was happy. I didn't think she â un, that she was going to do it because she was so happy and he'd been nice to her, and they went â we sat outside for a few minutes, and then her and Joey went in and took a bath together and then came out and then she rubbed his back for a little while and then they came back out and they sat on the couch and we were all hungry so me and Christy went and got â went to Subway and got some food, and then we came back home, and after we ate she got on the computer doing something and I was just laying down on the floor beside her and I fell asleep, and I'm not sure what time it was, but she woke me up and told me to go get in Tyler's bed. So I went up and got in Tyler's bed and so I wouldn't â so I'd be out of the middle of the floor and I went to sleep and I'm not sure what time, but Christy had set the alarm clock without me knowing and woke me up and then, but we â we went â 
Q. Do you have any idea what time it would have been? This was â this is going to be Saturday morning. Right?
A. Yeah. This would be Saturday morning.
Q. After midnight?
A. Yeah. It was like in the night â it was like â 
Q. Was it before the sun come [sic] up?
A. Yeah. It was like â I think it was like a little bit before four, but maybe three-thirty to four.
Q.A.M.?
A. Yes, sir.
Q. Okay.
A. And we went in his room and I didn't seriously think it would work and she was behind me and she put her hand on the trigger and I put my hand on the trigger and she kind of squeezed my trig â my hand because we didn't think it'd work.

Q. Can you show me â show me what you mean by â 
A. I had the gun like this and my hand was sitting right â 
BY OFFICER LINDSEY: What kind of gun was it?

*872 A. I'm not sure what brand, but it was just a .22.
BY OFFICER LINDSEY: .22 rifle?
A. Yes, sir.
EXAMINATION BY OFFICER WILLIAMS:
Q. Was it a automatic or bolt action?
A. It was a bolt action. And, uh, I was sitting right there and she had her hand on mine and we'reâ 

Q. Was she reaching around in front of you or â 
A. She was â she had her hand I know it was in front of me somehow, and then I just closed by eyes and did it and it went off. I didn't actually think it'd go off because it was broke.
Q. Had y'all tried to shoot it before?
A. Uh â 
Q. Before you brought it to the house had you tried to shoot it or â 
A. Unh â unh. It had been in my dad's closet for a least three or four years. Nobody had ever used it.
Q. Okay.
A. And then we did it and then she took the computer and some stuff to make it look like â 
Q. What â just whenever the shot was fired was she â 

A. She was â she was â 

Q. â she was behind you.

A. â likeâ 

Q. Was she aiming for you or, you know?

A. No. I don't guess so. I was just holding the gun. I wasn't really aiming at anything.

Q. Did you have it on your shoulder up here?

A. Yeah. I had it right here. I wasn't really aiming. I was just pointing it somewhere at this time.

Q. She had â and her hand was aroundâ 

A. No. She was â 
Q. â in front of you on the trigger?
A. She just had I guess that she was with one hand. I don't know where her left hand was, but she had her right hand I think like right here on my stomach, and then we did it and then after that I heard it go off and I looked at him and saw that it actually hit him and then I just ran out of the room.

ś 12. Near the end of the videotaped interview, his mother came in and asked the officers why she was not allowed to be present. The record reflects the following exchange:
BY DEFENDANT'S MOTHER: Tyler, â 
BY OFFICER WILLIAMS: Do â do you want him to stop talking to us? Do y'all want to â 
BY DEFENDANT'S MOTHER: I want to be here with him. This is my child. You have to understand.
BY OFFICER WILLIAMS: And he â he said prior that he â he wants to talk to you after he talks to us.
BY DEFENDANT'S MOTHER: Tyler, do you know what you're â I mean you're telling them the truth. Right?
BY THE DEFENDANT: (Head nodding yes)
BY DEFENDANT'S MOTHER: Huh?
BY OFFICER WILLIAMS: And he wants â and he wants to talk to you after he talks to us.
BY DEFENDANT'S MOTHER: They're not making you say stuff that you don't want to say?

*873 BY THE DEFENDANT: (Head nodding no)
BY DEFENDANT'S MOTHER: Look at me. Look at me. Are you having problems?
BY THE DEFENDANT: (Head nodding no)
BY DEFENDANT'S MOTHER: Well what's wrong?
BY OFFICER WILLIAMS: Do you want to go ahead and talk to her now, Tyler?
BY THE DEFENDANT: (Head nodding no)
BY DEFENDANT'S MOTHER: Do you? Son, just â Look, baby, tell me. Look. What's wrong? What's wrong, baby, Huh?
BY THE DEFENDANT: I'm telling the truth.
BY DEFENDANT'S MOTHER: Okay. What is the truth?
BY THE DEFENDANT: That me and Christy did it.
BY DEFENDANT'S MOTHER: Tyler, y'all killed him.
(DEFENDANT CRYING)
BY DEFENDANT'S MOTHER: Tyler! Tyler Wayne! Son look at me. Did you for real do that or are you just telling them that.
BY THE DEFENDANT: We done this.
BY DEFENDANT'S MOTHER: What did y'all do? Oh, God . . . Tyler Wayne, are you sure you did this?
BY THE DEFENDANT: Yes, Ma'am.
BY DEFENDANT'S MOTHER: Tyler, do you know what that means?
BY THE DEFENDANT: Yes, ma'am, momma.
BY DEFENDANT'S MOTHER: What â Tyler, what is going on?
BY THE DEFENDANT: She made me do it.
BY DEFENDANT'S MOTHER: Tyler Wayne.
BY THE DEFENDANT: I tried to get that old .22 that didn't work so it wouldn't work and so â 
BY DEFENDANT'S MOTHER: Tyler!
BY THE DEFENDANT: â after she â 
BY DEFENDANT'S MOTHER: Oh, God, . . . Tyler Wayne! Tyler, look at me. Stand up and talk to me, son.
BY THE DEFENDANT: Momma, I can't stand up. My legs are hurting.
BY DEFENDANT'S MOTHER: Could y'all let us stay here for a minute by ourselves? I don't understand.
BY OFFICER WILLIAMS: Sure.
BY DEFENDANT'S MOTHER: . . . Tyler Wayne, please stand up, son.
BY THE DEFENDANT: I can't.
ś 13. Two days after giving the videotaped confession, while in jail, Edmond called Marcus Sullivan, the father of one of Edmonds's female friends, and again confessed to killing Joey. The record reflects the following:
Q. Mr. Sullivan, where do you work?
A. Mississippi State.
Q. And what do you do for Mississippi State?
A. Computer programmer.
Q. Sir, do you know the defendant in this case, Tyler Edmonds?
A. Yes.
Q. How is it that you know Tyler Edmonds?
A. Tyler plays with Chasady. He comes to the house sometimes.
Q. Did you know Tyler Edmonds back in May of 2003, sir?
A. Yes.
Q. Let me take you back to the night of Wednesday, May 14th, 2003. That's the Wednesday night following *874 Mother's Day. Do you recall that night, sir?
A. Yes.
Q. At that time were you aware â well, let me ask you this. Did you know who Joey Fulgham was?
A. No, sir.
Q. Were you aware that there was an individual named Joey Fulgham who had been murdered over here in Oktibbeha County?
A. Yes.
Q. Were you aware that this defendant, Tyler Edmonds, had been charged with the murder of Joey Fulgham?
A. Yes.
Q. On that night, on that Wednesday night â well, had you been to work that day, sir?
A. Yes, sir.
Q. Once you returned home that Wednesday night, did you ever have occasion to speak by telephone with this defendant, Tyler Edmonds?
A. Yes, sir.
Q. Would you please tell the ladies and gentlemen of the jury how it was that that happened?
A. Tyler called the house and I was the only one home and he wanted me to get in touch with his mother. He had been trying to call his mother's house and there was no answer, and he asked had I heard about Joey, and I said I had. There was a pause and I asked him, Did you do it? He said, Yes, sir.

Q. You asked him point blank, Did you kill Joey Fulgham?

A. I asked him, Did you do it?

Q. And what was his response, sir?

A. Yes, sir.

ś 14. Four days after giving the videotaped confession, and two days after confessing to Sullivan, Edmonds gave a letter to Oktibbeha County Sheriff Dolph Bryan in which he requested to speak with Chief Deputy George Carrithers. In the letter, Edmonds said:
I know that I have an attorney and I also know that I have the right to remain silent, but I have some important things to report. I would like to speak to Mr. George Carrithers about the murder case on Joseph Fulgham. I am willing to tell everything that I know in order to be exempt from jail/juvenile.

ś 15. On the same day that the letter was delivered to Sheriff Bryan (May 16), Edmonds, in a videotaped statement, recanted his earlier statement that he and Kristi killed Joey, and contended that Kristi acted alone. In this videotaped statement, Edmonds claimed to have been in the car when he heard a loud "pop" and to have not known that Joey had been shot until much later.

ANALYSIS AND DISCUSSION OF THE ISSUES
I. Voluntariness of Edmonds's Confession
ś 16. In this assignment of error, Edmonds argues that the trial court should have granted his motion to suppress his confession. The primary thrust of Edmonds's argument on this point is that his age, his lack of experience with law enforcement interrogation, the removal of his mother from the room during the interrogation, and the fact that the police officers allegedly used Kristi to pressure him into confessing, caused his confession to be unreliable, involuntary, and inadmissible.
*875 ś 17. The trial court conducted a suppression hearing to determine whether Edmonds's confession was voluntarily and intelligently given. The record reflects that the trial court heard testimony from Officers James Lindsey, Tommy Whitfield, and Shannon Williams, in addition to Edmonds's mother, Sharon Clay, and his father, Danny Edmonds. The trial court also viewed the videotape of Edmonds's initial confession. The record also reflects that, prior to confessing, Edmonds, along with his mother, signed Miranda waiver of rights forms. There is no testimony that either of them asked for an attorney or for the interrogation to stop. Furthermore, the videotape interview was preceded by a second Miranda waiver of rights form, which was signed by Edmonds.
ś 18. In Dancer v. State, 721 So.2d 583, 586 (ś 11) (Miss.1998), the Mississippi Supreme Court addressed the admissibility of a waiver of rights and confession by a thirteen-year-old mentally-slow defendant. The Dancer court, quoting McGowan v. State, 706 So.2d 231, 235 (ś 19) (1997), held that "[w]hether there was an intelligent, knowing and voluntary waiver is essentially a factual inquiry to be determined by the trial judge from the totality of the circumstances." Dancer, 721 So.2d at 587 (ś 19). The court quoted approvingly from Fare v. Michael C., 442 U.S. 707, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979): "This totality-of-the-circumstances approach is adequate to determine whether there has been a waiver even where interrogation of juveniles is involved. We discern no persuasive reasons why any other approach is required where the question is whether a juvenile has waived his rights, as opposed to whether an adult has done so. . . ." Dancer, 721 So.2d at 587 (ś 19). In Hill v. State, 749 So.2d 1143, 1148 (ś 10) (Miss.Ct. App.1999), this Court cited Dancer and noted that "the supreme court [in Dancer] held to the rule that the totality of the circumstances applied to assessing whether the waiver and confession were properly obtained." We noted that the court in Dancer used the fact that the evidence demonstrated that Dancer could read and write, that he had completed sixth grade, and that he was not coerced or threatened, to support the trial court's finding that the confession was knowingly and voluntarily given. Id. Applying prior precedent and considering the totality of the circumstances, we find no basis for concluding that Edmonds's confession was not voluntarily and intelligently given.
ś 19. Edmonds would have this Court adopt and institute new procedures specially applicable to youthful offenders. Specifically, Edmonds argues "that parents have a fundamental due process right to make decisions concerning the care, custody, and control of their children." Therefore, Edmonds contends that parents should be able to control a minor child by being present when police officers question the child about crimes of such a serious nature as the one before this Court. However, Mississippi appellate courts have spoken on the issue of parental presence during interrogation for a capital crime. In Hill, we stated:
It is clear Hill had no constitutional or statutory right to have his parents present during his interrogation for this capital crime. Additionally, pursuant to Clemons [v. State, 733 So.2d 266 (Miss. 1999) (a case involving a fourteen-year-old defendant)], it appears equally certain that Hill's parents could not assert his constitutional rights to counsel and against self-incrimination on his behalf as this matter was in the jurisdiction of the circuit court beyond the protective environment of our youth court.
Hill, 749 So.2d at 1148 (ś 12). Under existing law and precedent, this Court is bound to apply the same standards for the *876 voluntariness of Edmonds's confession as it would for any other confession. Dancer, 721 So.2d at 587 (ś 17). Therefore, there is no merit to the argument that Edmonds's mother should have been present while he was being questioned about his involvement in the murder.
ś 20. We briefly address Edmonds's contention that Kristi somehow pressured or coerced him into confessing. The crux of this argument centers on the police officers bringing Kristi into the room to speak with Edmonds immediately before he confessed. A review of the record reveals that Edmonds's account of what happened regarding this situation is not completely accurate. Deputy Tommy Whitfield, one of the sheriff deputies initially involved in the questioning of Edmonds, testified to the following:
[Kristi] agreed that she would tell Tyler what she had told us so I went to the break room and got Tyler to come back into the office with Kristi. He sat down in the chair next to her. She told Tyler to hold her hand. He held her hand and she told Tyler something to the effect of it's okay. I told the truth. You can tell the truth. . . . We got Tyler up and took him straight to the next office and that's when James and Shannon did the video statement.
ś 21. It is ironic that Edmonds maintains that Kristi pressured him into confessing, while at the same time admitting in his testimony that he did not tell the authorities what Kristi told him to tell them. According to Edmonds's trial testimony, Kristi told him to say that he killed Joey and that it was an accident. However, out of a total of three statements,[3] Edmonds never stated that it was an accident, and in the first statement, even denied having any knowledge of the killing until sometime later when people started calling Kristi to tell her that Joey had been found dead. In the second statement, which was the first videotaped statement, Edmonds still did not say that the killing was an accident. Further, he did not take responsibility alone, as Kristi had instructed him to do. Instead, he implicated her, along with himself. While they were in jail, Kristi wrote him a letter reminding him that he still had not stated that the killing was an accident. If Kristi had applied the pressure that Edmonds would have us believe was applied, at least one of his statements would have been more favorable to her.
ś 22. Moreover, our holding that the trial court did not err in finding that Edmonds's confession was voluntarily given is buttressed by his heart-wrenching admission to his mother that he and Kristi did it. We will not repeat that portion of the confession here, as we have set it forth in toto in the facts portion of this opinion. Suffice it to say that his mother begged him to tell her that he had no involvement, but he steadfastly and adamantly insisted that he and Kristi did it. Even after the deputies left the room, Edmonds did not waiver in his confession to his mother that he and Kristi did it. The exchange with his mother is extremely compelling, and is indicative of the fact that Edmonds voluntarily confessed without any undue pressure, coercion, or threats from law enforcement officers, Kristi, or anyone else.
ś 23. An amicus brief filed with this Court by the Center on Wrongful Conviction and the Innocence Project New Orleans suggests that we adopt two new per se rules â one excluding any statement taken *877 from a minor outside the presence of his parents, and another requiring that law enforcement record the entire custodial interrogation of a minor. If we do not adopt a rule requiring a full recording of the interrogation of a minor, the amicus brief asks that we at least adopt a rule requiring that we look with extra suspicion on the voluntariness of a confession obtained without a full recording. We offer no opinion on the efficacy of the suggested rules, but point out that it is beyond the authority of this Court to adopt them. Any such changes in our rules of procedure or evidence must come from the Mississippi Supreme Court, while any changes regarding the court's jurisdiction of cases involving juveniles must be made by the Mississippi Legislature.
II. Exclusion of Testimony of False Confession Expert
ś 24. Edmonds's allegation of error pertains to an expert witness, Dr. Allison Redlich, that he sought to introduce at trial. Dr. Redlich is an expert in the study of false confessions and has co-published, "Taking Responsibility for an Act Not Committed: The Influence of Age and Suggestibility." Law and Human Behavior, vol. 27, no. 2, April 2003. Edmonds sought to have her testify about the characteristics of false confessions and their alleged prevalence among juveniles.
ś 25. In 1993, the United States Supreme Court clarified the federal standard for the admission of expert testimony in Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).[4] In so doing, the Court recognized that the Federal Rules of Evidence had overruled the previous test for the admission of expert testimony, set out in Frye v. United States, 293 F. 1013, 1014 (D.C.Cir. 1923). Frye had applied a "general acceptance" test for the admission of expert testimony, whereby "a scientific technique is inadmissible unless the technique is `generally accepted' as reliable in the relevant scientific community." Daubert, 509 U.S. at 584, 113 S.Ct. 2786. Daubert, by contrast, held that an expert's testimony should be admissible if it is both relevant and reliable. Id. at 589, 113 S.Ct. 2786.
ś 26. The Daubert court described the analysis that judges must apply when determining admissibility as a two-step inquiry: "the trial judge must determine at the outset . . . whether the expert is proposing to testify to (1) scientific knowledge [reliability] that (2) will assist the trier of fact to understand or determine a fact in issue [relevance]." Id. In answering this inquiry, Daubert urged courts to use a non-exhaustive list of factors to help determine the admissibility of expert testimony: (1) whether the theory can be, and has been, tested; (2) whether the theory has been published or subjected to peer review; (3) any known rate of error; and (4) the general acceptance that the theory has garnered in the relevant expert community. Id. at 593-94, 113 S.Ct. 2786.
ś 27. In further describing the admissibility of expert testimony, the Court emphasized that "[t]he inquiry envisioned by Rule 702 is . . . a flexible one." Id. at 594, 113 S.Ct. 2786. The Court also stated that "an expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation." Id. at 592, 113 S.Ct. 2786.
ś 28. Although Daubert was decided in 1993, Mississippi did not adopt the Daubert *878 standard until 2003, in Miss. Transp. Comm'n v. McLemore, 863 So.2d 31 (Miss. 2003). Prior to adopting the Daubert standard, Mississippi utilized the "general acceptance" standard as articulated in Frye. In McLemore, the Mississippi Supreme Court adopted Daubert because Rule 702 of the Mississippi Rules of Evidence (governing the admissibility of expert testimony) was amended May 29, 2003. The court found that the amended comment "makes no mention of Frye or the general acceptance test. Thus, the current version of Rule 702 recognizes that the Daubert rule, as modified, provides a superior analytical framework for evaluating the admissibility of expert witness testimony." Id. at 39 (ś 22).
ś 29. In McLemore, the Mississippi Supreme Court also provided additional guidance as to the role of the trial court as "gatekeeper": "whether testimony is based on professional studies or personal experience, the `gatekeeper' must be certain that the expert exercises the same level of `intellectual rigor that characterizes the practice of an expert in the relevant field.'" Id. at 37-38 (ś 15) (quoting Kumho Tire, 526 U.S. at 152, 119 S.Ct. 1167).[5] In summary, McLemore reiterated that the trial court's job is to perform a two-pronged inquiry: (1) whether the expert's testimony would be relevant, and (2) whether the proposed testimony is reliable. Id. at 38 (ś 16) (citations omitted). The court repeated the Daubert caution that the determination of whether to allow an expert to testify is "flexible." Id. The court also noted that "there is universal agreement that the Daubert test has effectively tightened, not loosened, the allowance of expert testimony." Id. at 38 (ś 17) (citing Hammond v. Coleman Co., 61 F.Supp.2d 533, 537 (S.D.Miss.1999)).
ś 30. When reviewing a trial court's decision to admit or reject expert testimony, the standard of review that we employ is abuse of discretion. Id. at 40 (ś 28). Therefore, we will not reverse the trial judge's decision to deny the testimony of Dr. Redlich unless there was an abuse of discretion.
ś 31. Dr. Redlich offered an impressive curriculum vitae to the court. She received her Ph.D. in developmental psychology from the University of California at Davis, has held numerous research and teaching positions, and has received several awards for her work. In addition, she has been published in numerous publications, has several manuscripts under review or in progress, and has given numerous guest presentations and lectures. Two of the articles she has published were peer-reviewed. In short, there is no doubt that Dr. Redlich is eminently qualified in the study of false confessions. Her personal qualifications, however, do not make testimony about the field of false confessions admissible in court.
ś 32. After a day-long, pre-trial Daubert hearing on whether Dr. Redlich would be allowed to testify, the trial judge entered an order finding that Dr. Redlich's proposed testimony did "not satisfy the dictates of Mississippi Rule of Evidence 702 and will be excluded." In its order, the court pointed out that "Dr. Redlich admitted that there is no empirical test available to determine whether a confession is truthful or not. Redlich also admitted that the hypothesis of false confessions cannot be tested empirically. Moreover, she could not say that there was a correlation *879 between youth in her test who falsely confessed to hitting the `Alt' key and youth who falsely confessed to committing various felony crimes."[6] Dr. Redlich testified that it would be impossible to do an empirical test of false confessions because to do so would require taking juveniles to police stations and accusing them of crimes they had not committed. The court found that, overall, "Redlich indicated that there was very little study of false confessions and juveniles."[7] The court then engaged in an application of Redlich's proposed testimony to the Daubert factors.
ś 33. As to the first factor, whether the theory has or can be tested, the trial court accurately found that Redlich herself had already admitted that the theory could not ethically be tested, and therefore would not be tested at all. The court also noted that it "was not able to determine if Redlich's assertion that there is a widespread misconception among the public that persons do not confess falsely unless they have been tortured or abused had been tested or is testable." The court was not required to accept Redlich's mere assertion that there was such a misconception, because "[n]either Daubert nor the Federal Rules of Evidence requires that a court `admit opinion evidence that is connected to existing data only by the ipse dixit of the expert,' as self-proclaimed accuracy by an expert is an insufficient measure of reliability." McLemore, 863 So.2d at 37 (ś 13) (quoting Kumho Tire, 526 U.S. at 157, 119 S.Ct. 1167). Although the trial court recognized that the psychology of false confessions is a social science and is not "Newtonian physics," the court nonetheless found that "nothing in Daubert or its progeny hold [sic] that testability should be waived when evaluating the reliability of social science testimony." The court pointed out that "personality inventory tests developed by social scientist [sic] such as the Minnesota Multiphasic Personality Inventory `MMPI-II' have validity scales and thus, are testable."
ś 34. In evaluating the second factor, whether the theory has been subjected to peer review and publication, the trial court found that, although there are "a number of publications regarding false confessions. . . . the proponents of the field of expert testimony regarding false confessions appears to be a small group." Specifically, the court noted that the "group" appears to be six people, and there are two people who have attacked the field of false confessions.[8] It is not clear from the court's *880 order that it found that this factor weighed strongly against the admissibility of Dr. Redlich's testimony, but the court clearly questioned the extent and quality of publication and peer review in what it deemed to be an "infant field."
ś 35. The trial court also found that the third Daubert factor, known or potential rate of error, weighed against the admissibility of Dr. Redlich's testimony. As the court pointed out in its order, Dr. Redlich herself testified that there is no way to discern a possible rate of error in the field of false confessions, because the theory cannot ethically be tested. Therefore, the court found that this factor also "militates against admissibility."
ś 36. In analyzing the final Daubert factor, general acceptance in the relevant scientific community, the court looked to how much acceptance the theory had gained in terms of admissibility in other courts. The trial judge found that some cases had allowed such testimony, some cases had addressed false confession experts but not allowed or rejected their admissibility, and some cases upheld a trial court's decision that false confession expert testimony should be excluded. After reviewing all the cases, the court held that it could not "say that expert opinion in the field of coerced or false confessions is widely accepted within the scientific community."
ś 37. After reviewing the court's order, the record, and the relevant case law, we do not find that the court abused its discretion in rejecting the proposed testimony of Dr. Redlich. Whether we would have found the same result or a different one, the court did not abuse its discretion in finding that Dr. Redlich's testimony did not meet the standards for admissibility of expert testimony.
ś 38. We note that, although this particular issue is an area of first impression in Mississippi, the Mississippi Supreme Court has addressed an appeal concerning the admission of an expert on false confessions. In Thorson v. State, 895 So.2d 85, 123 (ś 89) (Miss.2004), the Mississippi Supreme Court held that it could "find no evidence that the trial court abused its discretion in denying funds to hire Dr. [Richard] Leo." As previously noted above, Dr. Leo is one of the major proponents of the validity and admissibility of false confessions. In Thorson, the defendant appealed, arguing that the lower court's refusal to give him funds to hire Dr. Leo constituted reversible error. The Mississippi Supreme Court noted that "Thorson was only able to show the trial court that there was a mere possibility of assistance from Dr. Leo," and Thorson therefore could not show a "substantial need" to hire him. While Thorson did not deal with the same issue before us, the court did note that "several jurisdictions have held that this type of testimony [on false confessions], which essentially goes to the credibility of a witness, is not an appropriate subject for an expert witness, but should be left to the province of the jury." Thorson, 895 So.2d at 123 (ś 89) (citing United States v. Adams, 271 F.3d 1236 (10th Cir. 2001); State v. Tellier, 526 A.2d 941 (Me. 1987); State v. Ritt, 599 N.W.2d 802 (Minn.1999); State v. Davis, 32 S.W.3d 603, 608 (Mo.Ct.App.2000)).
ś 39. Therefore, although the Mississippi Supreme Court has not explicitly ruled on the admissibility of expert testimony about false confessions, we find that the *881 court's obvious questioning of the validity of such testimony lends credence to the trial judge's ruling.
ś 40. As support, Edmonds points to the fact that Mississippi courts allow testimony about the unique behaviors of sexually abused children. However, the trial judge also addressed this argument, and pointed out that "[c]hild sexual abuse testimony must also pass the relevance and reliability standards that all expert testimony must pass to be admissible." Simply because a court found that testimony about child sexual assault was relevant and reliable, does not mean that false confession testimony is also relevant and reliable. The trial court in this case could only make its ruling based on whether the evidence that Dr. Redlich presented showed that her testimony and field of expertise are relevant and reliable enough to be admissible in court. As the trial court summarized, whatever evidence was presented that convinced the court in Crawford v. State, 754 So.2d 1211 (Miss.2000) (overruled on other grounds), that expert testimony about sexually abused children met the Daubert standard, was lacking in the present case.
ś 41. Edmonds also points to Crane v. Kentucky, 476 U.S. 683, 689, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986), where the Supreme Court held that a defendant should be allowed to answer the following question: "If the defendant is innocent, why did he previously admit his guilt?" However, in Crane, the defendant had been prevented from presenting the circumstances surrounding his confession, such as the fact that he had been held in a windowless room for a long time, that he had been "surrounded by as many as six police officers during the interrogation," that he had not been allowed to contact his mother, and that he was badgered by the police officers questioning him. Crane, 476 U.S. at 684-85, 106 S.Ct. 2142. Therefore, the issue in Crane was completely different from the issue now before us. The Supreme Court's holding that a defendant should be allowed to testify as to the circumstances of his confession does not necessitate that a defendant be allowed to present expert opinion about false confessions. Any expert-opinion evidence presented by the defendant to answer the question of why he admitted his guilt must still meet the requirements of the rules of evidence. In fact, the Crane court explicitly stated that "we have never questioned the power of States to exclude evidence through the application of evidentiary rules that themselves serve the interests of fairness and reliability â even if the defendant would prefer to see that evidence admitted." Id. at 690, 106 S.Ct. 2142 (citing Chambers v. Mississippi, 410 U.S. 284, 302, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973)). Therefore, Crane does not compel us to find that Dr. Redlich's testimony was admissible.
ś 42. Edmonds argues that affirming the ruling of the trial court will have the effect of forbidding any defendant in Mississippi from ever introducing evidence about false confessions. We fully appreciate Edmonds's point, but we think it is too early to tell whether this will necessarily be the final result. The court here made it clear that it simply found Dr. Redlich's proposed expert testimony unreliable under Daubert. Given maturation in the field of false confessions, and time for the subject to expand and grow, we see no reason why a defendant in the future might not properly convince a court that expert testimony as to false confessions is admissible under Daubert. However, we cannot hold that the court here erred in finding that the offered testimony was inadmissible.
*882 ś 43. Edmonds also cites a number of cases from other jurisdictions which reversed because a false confession expert was not allowed to testify about her field of expertise. However, we note that many of these cases are unreported, and therefore, not proper authority for this Court to address. Of the remaining cases, many were reversed for specific, narrow reasons. In United States v. Hall, 93 F.3d 1337 (7th Cir.1996), the case was reversed specifically because no Daubert hearing had ever been held to determine whether the testimony of an expert on false confessions was admissible. The case sub judice is distinguished by the fact that a Daubert hearing was, in fact, held. In Boyer v. State, 825 So.2d 418 (Fla. 1st DCA 2002), the trial court found that Dr. Ofshe was qualified as an expert, but incorrectly held that his testimony would not be helpful to a jury. Again, the case was not reversed because the higher court believed that expert testimony about false confessions was necessarily admissible, but because the trial court had improperly found that such testimony would not be helpful to a jury. Miller v. State, 770 N.E.2d 763 (Ind.2002), reversed a trial court's exclusion of the entirety of Dr. Ofshe's testimony, instead of just a part of the statement. As in Boyer and Hall, the reversal was not because the lower court had found that false confession expert testimony meets Daubert, but was because the lower court had improperly excluded all of a witness's testimony. In United States v. Hall, 974 F.Supp. 1198 (C.D.Ill.1997), the court reversed where a false confession expert's testimony had been ruled inadmissible, but cautioned that such testimony should be allowed only generally (the expert could explain that false confessions exist and give testimony as to what causes false confessions, but could not apply those factors and analysis to the particular defendant and theorize as to what had made that defendant falsely confess).
ś 44. Given the above cases, very few of which strongly endorse the admissibility of expert testimony on false confessions, the numerous cases from other jurisdictions holding that such testimony is inadmissible,[9] and the doubt that the Mississippi Supreme Court has cast on the admissibility of such testimony, we hold that the court did not abuse its discretion in declining to allow Dr. Redlich to testify about false confessions. The court clearly read and addressed all of the material before it in addressing the Daubert factors and in denying Dr. Redlich's testimony. We find no fault with the result reached by the trial court.
III. The Admissibility of Dr. Hayne's Testimony
ś 45. In framing his argument under this issue, Edmonds is a bit disingenuous. He contends that Dr. Hayne's opinion was that two persons (Edmonds and Kristi) simultaneously pulled the trigger of the gun that fired the shot that killed Joey. Before delving into our discussion of this issue, it is helpful to put into context how the matter of the two-person-trigger-pulling matter arose. To do so, we consult the record, first, for the direct examination of Dr. Hayne, and then the cross-examination.
Q. Dr. Hayne, you have had an opportunity to review photographs of where Mr. Fulgham's body was found; is that correct?
A. Yes, Ma'am.

*883 Q. And the condition and the location and the position that his body was found; is that correct?
A. That's correct, Counselor.
Q. In addition, sir, you had an opportunity to view a videotaped confession of this defendant; did you not?
A. I did, ma'am.
Q. And portions of his version of how Mr. Fulgham was killed and how the gun was held and things of that nature; is that correct?
A. Yes, Ma'am.
Q. Based on the path of the projectile and everything that you viewed, do you have an opinion as to whether or not the defendant's version of the events is consistent with what you found in Mr. Fulgham?
BY MR. WAIDE [DEFENSE ATTORNEY]: Your Honor, if the Court please, I object to as being totally outside of anything in his report and also outside of anybody's expertise, and under Daubert, he would have to show some basis for some expert opinion of anything like that.
BY THE COURT: Let's approach.
ATTORNEYS APPROACHED BENCH AND BENCH CONFERENCE WAS CONDUCTED OUTSIDE THE HEARING OF THE JURY PANEL AS FOLLOWS:
BY MS. FAVER [PROSECUTOR]: Once again, Your Honor, the full report, all the diagrams, all the medical records, everything was provided to counsel in discovery. It was a ten-page autopsy report with attachments of diagrams, the pattern of the projectile, the path that the projectile went through Mr. Fulgham's skull, and everything of that nature. Everything has been turned over, the pictures, everything; and I believer under Holland, Dr. Hayne can within his medical degree of certainty and his expertise testify whether or not the injuries sustained by this victim is consistent with the defendant's version of what happened.
BY THE COURT: Is that Holland, 705 So.2d.?
BY MR. WAIDE: Your Honor, if the Court please, under the Daubert case which the Supreme Court has adopted, he has to show â we would be entitled to a Daubert hearing to show there's some scientific study on this area as to whether a pathologist has some expertise in saying that a version where two people hold a gun and shoot somebody sleeping is consistent with the manner of death, some scientific basis. The fact that he's a pathologist qualifies him to talk about the time of death, not anything like that. BY MS. FAVER: Your Honor, he's not just a pathologist. He's a forensic pathologist. There is a distinction.
BY THE COURT: There is. The court in Holland versus State, 705 So.2d has allowed forensic pathologist to give opinions about whether the defendant's version of the events and the evidence as found on the victim based upon a reasonable degree of medical certainty and their expertise is consistent. I remember that case. It was panties shoved down the woman's throat and all. I will allow the question and the answer based on Holland v. State. I think there are â were some others after and before Holland even, but I was at the Supreme Court as a clerk when Holland was handed down and I have familiarity with that case and I will allow the question to be asked. You can certainly cross-examine him on the basis for that statement on cross.
BY MS. FAVER: Thank you, sir.
(BENCH CONFERENCE CONCLUDED)

*884 BY THE COURT: You may proceed.
BY MS. FAVER: Thank you.
BY MS. FAVER: (Continuing)
Q. Doctor, I had asked you regarding your examination of the victim, Joseph Fulgham, your examination of the photographs, the crime scene video, the location that Mr. Fulgham was found, and this defendant's version of what happened and how he was killed, based on a medical degree of certainty or within a medical degree of certainty, do you have an opinion one way or another whether or not that is consistent?
A. I do.
Q. And what is that, Doctor?
A. Within a reasonable medical certainty, it's consistent with the scenario provided to me and would be in compliance with the facts I saw.
ś 46. As can be seen from the quoted passages, the State did not ask Dr. Hayne whether his autopsical findings were consistent with two people pulling the trigger. Moreover, Dr. Hayne did not testify to such a finding. The precise question asked by the State that drew the objection was this:
Based on the path of the projectile and everything that you viewed, do you have an opinion as to whether or not the defendant's version of the events is consistent with what you found in Mr. Fulgham?
Because of the intervening objection, this question was not answered. After the objection was overruled, the State then asked this question:
Doctor, I had asked you regarding your examination of the victim, Joseph Fulgham, your examination of the photographs, the crime scene video, the location that Mr. Fulgham was found, and this defendant's version of what happened and how he was killed, based on a medical degree of certainty or within a medical degree of certainty, do you have an opinion one way or another whether or not that is consistent?
ś 47. Obviously, Dr. Hayne was competent to testify regarding the path of the projectile from the point it entered Joey's body. Because the autopsy provided Dr. Hayne with knowledge of the angle that the projectile traveled after entering Joey's body, Dr. Hayne also was competent to testify regarding the angle of the projectile prior to entering Joey's body, for it would have continued to travel at that angle unless it was deflected by striking a bone or some other hard object in Joey's body. There is nothing in Dr. Hayne's answer to the State's question which remotely suggests that he was opining about two people pulling the trigger of the murder weapon.
ś 48. As is seen in the following exchange between Dr. Hayne and defense counsel, it was the defense which brought up the matter of the two-person firing the shot.
Q. Dr. Hayne, You testified earlier that the defendant's statement that you saw was consistent with how the gunshot wound occurred?
A. It would be consistent with the physical findings that I observed and the information provided to me by opposite side counsel.
Q. And do you understand that the evidence is that two people fired that shot?

A. That was essentially the summary of the information given to me and seen on the video.
Q. And let's suppose if one person had fired that shot, would your opinion be the same?

*885 A. I could not exclude that; however, I would favor that a second party be involved in that positioning of the weapon.

Q. And what would be the distance of the shot?
A. The distance?
Q. Based on the fact that if one person had done this?
A. The distance of the shot, if you're addressing the muzzle of the weapon to the back of the head, all I can tell you it's at least two or three inches away. If you are talking about the relative position of the weapon, then I would indicate that the weapon was placed much more towards the bed and that would be consistent with one person assisting another person to achieve that trajectory, the aiming of the weapon. Since it would be past the center line of the decedent's head and fired, 20 degrees past the center line of the head, so, therefore, it would be consistent with two people involved. I can't exclude one, but I think that would be less likely.
Q. And of course, this was information provide to you by opposite counsel; isn't that correct?
A. Not all. It's provided on video. Also, some of the information derived from the autopsy itself, and then also looking at the photographs of the scene.
ś 49. In considering Dr. Hayne's testimony in context, it is critical to remember that in Edmond's confession, Edmonds â despite saying at one point that Kristi's hand was on the trigger â made it clear during further questioning that he was unsure of the location of either of Kristi's hands when the fatal shot was fired, although he thought her right hand was on his stomach. Of equal importance is Edmonds's statement that he "was just holding the gun" and "wasn't really aiming at anything," that he "was just pointing it somewhere at [that] time."
ś 50. It is not debatable that Joey was shot almost in the center of the back of his head. For that to happen, someone had to aim or point the gun toward Joey's head. If Edmonds did not do the aiming, then Kristi did. On these facts, we do not find Dr. Hayne's testimony problematic for two reasons.
ś 51. First, it was the defense, not the State, that asked the question regarding the two-person-trigger-firing scenario. Second, it is clear that the point which Dr. Hayne was attempting to make is that, given Edmonds's testimony that Edmonds did not aim the weapon at anything, it was more likely than not that another person assisted. This interpretation is clearly borne out by Dr. Hayne's answer to the following hypothetical question asked by the defense attorney: "And let's suppose if one person had fired that shot, would your opinion be the same?" Dr. Hayne's answer was, "I could not exclude that; however, I would favor that a second party be involved in that positioning of the weapon." Had Edmonds not stated in his confession that he did not aim the weapon, there would not have been any basis for Dr. Hayne to answer as he did. Dr. Hayne is a well-respected forensic pathologist who has performed many autopsies in this state and has given in-court expert testimony numerous times. He knows that you cannot look at a bullet wound and tell whether it was made by a bullet fired by one person pulling the trigger or by two persons pulling the trigger simultaneously. The record does not bear out Edmonds's contention that that was Dr. Hayne's testimony in this case.
*886 ś 52. Therefore, we find no merit in Edmonds's assertion that a Daubert hearing was required before Dr. Hayne could answer the question that drew the objection from the defense. At that time, Dr. Hayne had already been qualified as an expert in forensic pathology. We agree with the trial court that, under Holland v. State, 705 So.2d 307 (Miss.1997), Dr. Hayne, as a qualified forensic pathologist, was competent to answer the question asked him by the State, without being subjected to a Daubert hearing.
ś 53. Even if we were to hold that the trial court erred in allowing Dr. Hayne to answer the State's question without conducting a Daubert hearing, based on the evidence in this case, we would hold it harmless error, given the fact that Edmonds admitted not once but twice that he killed Joey. It cannot be legitimately argued that Edmonds's admission to Sullivan was tainted by Kristi's influence or by any tactics used by law enforcement. As we noted in the facts portion of this opinion, Edmonds voluntarily called Sullivan from the jail and informed Sullivan that Edmonds committed the murder. Additionally, the defense presented Dr. James Lauridson, a forensic pathologist with twenty years of experience, who categorically disputed any suggestion that a forensic pathologist or anyone else could look at a wound and the trajectory of the bullet that caused the wound and tell how many persons fired the shot. Surely, if Dr. Hayne's testimony had the effect that the dissent would have us believe it did, Dr. Lauridson's testimony served as a counterweight to it, robbing it of any undue prejudicial weight on the jury. This issue is devoid of merit.
ś 54. In support of its view that Dr. Hayne's testimony was unfairly prejudicial to Edmonds, the dissent quotes the following passage from the State's opening statement: "You're going to hear how Kristi stood behind him and held him and you're going to hear how they both put their finger on the trigger and you're going to hear how they both shot and killed Joey Fulgham." The dissent reads this statement as conclusive proof that the State was postulating a two-person-trigger-pulling theory as the centerpiece of its case against Edmonds. We find the dissent's deduction flawed because of one obvious reason: during the State's examination of Dr. Hayne, it did not attempt to develop such a theory. If the central focus of the State's case was the two-person-trigger-pulling theory, we find it indeed strange that the State never asked the question that was the centerpiece of its case.
ś 55. We believe that the statement of the prosecutor was not that two people, at the same time, pulled the trigger of the gun that killed Joey Fulgham. What the prosecutor said was "you're going to hear how they both put their finger on the trigger and you're going to hear how they both shot and killed. . . ." Parsed literally, it is clear that the prosecutor was merely summarizing Edmonds's confession.
ś 56. In his confession, Edmonds, at one point, stated that both he and Kristi had their fingers on the trigger of the gun, and at a later point, stated that he really did not know where Kristi's hands were, although he thought that her right hand was on his stomach. Edmonds makes clear, however, that immediately before the fatal shot was fired, Kristi was assisting him in some way. It is a reasonable extrapolation from Edmonds's descriptive depiction of Kristi's assistance that Kristi assisted in the aiming and positioning of the gun. This conclusion is undergirded by the fact that Edmonds said he did not aim the gun, yet the bullet hit the intended target. We believe that it is that facet of *887 Edmonds's confession that the prosecution was referencing in stating that "they both shot and killed Joey Fulgham," and we find it highly unlikely that the State's opening argument was intended to indicate that both Kristi and Edmonds pulled the trigger together, thereby killing Joey. If that was what the State had intended to lay out for the jury, the statement would have sounded something like: "you're going to hear how they both put their finger on the trigger and you're going to hear how they both then shot and killed Joey Fulgham."
ś 57. The dissent's next contention, that the trial judge forced the defense to delve into the matter of the two-person-trigger-pulling scenario, is likewise not borne out by the record. When the trial judge stated to the defense that the defense could cross-examine Dr. Hayne on Dr. Hayne's basis for that statement, Dr. Hayne had neither made a statement nor given any indication that he either believed that the manner of Joey's death was consistent with Edmonds and Kristi both pulling the trigger or that it was consistent with one helping the other in any manner. The trial judge was actually responding to the following statement made by the defense: "[W]e would be entitled to a Daubert hearing to show there's some scientific study on this area as to whether a pathologist has some expertise in saying that a version where two people hold a gun and shoot somebody sleeping is consistent with the manner of death, some scientific basis." As already noted, the pathologist, Dr. Hayne, had said nothing about any version of Edmond's confession. That was the defense characterization of what the evidence showed. Therefore, the most logical explanation of the trial judge's statement is that the trial judge was saying to the defense, "if you believe that is what Dr. Hayne's opinion is, you can cross-examine him on it."
ś 58. For the reasons discussed above, we believe the dissent has read too much into the prosecution's opening statement and has found prejudicial effect where none exists. We now return to a discussion of the other issues.
IV. Failure of the State to Disclose Dr. Hayne's Two-Person-Trigger Firing Opinion
ś 59. Edmonds also argues that the court erred in allowing Dr. Hayne's testimony because the State failed to disclose to him that Dr. Hayne would testify that two people pulled the trigger of the murder weapon. As we have already noted, that was not Dr. Hayne's testimony on direct examination. Therefore, there was no obligation to disclose anything. Further, it was Edmonds's own counsel who asked the hypothetical question, giving rise to the answer about which Edmonds now complains. For obvious reasons, the State cannot be expected to disclose, as a part of its pretrial discovery obligations, the answers which its expert may give to cross-examination questions that are propounded for the first time during trial. We find no merit in this issue.
V. Exclusion of Statement of Witness Who Died Before Trial
ś 60. In his fifth point of error, Edmonds alleges that the court erred in refusing to admit the statement of Toni Mitchell, a witness who died before the trial began. Mitchell had previously given the police a statement, saying that Kristi Fulgham had asked her for a gun to shoot a dog. Edmonds argued that this statement would corroborate his assertion in his recanted confession that Kristi had also *888 asked him for a gun to shoot a dog.[10] Although the court did not allow the statement to be introduced at trial, Mitchell's granddaughter, Vanessa Sistrunk, testified at trial that Kristi had asked both her and her grandmother for a gun.
ś 61. After being asked by Edmonds's counsel to "Tell us what she said about the dog," Sistrunk testified that Kristi said "[t]hat she [Kristi] would like to borrow a gun. I told her that I did not have one. She said that she had asked my granny, Toni Mitchell, about the gun." At that time, the State objected, and the court instructed Edmonds's counsel to "ask specific questions and don't give your witnesses just license to. . . ." Edmonds's counsel then rephrased his question to ask Sistrunk only what Kristi had told Sistrunk herself. Sistrunk then testified that Kristi had asked her to get a gun so she could shoot a stray dog. When asked if Kristi said she was having a problem with the dog, Sistrunk testified that Kristi "said she wanted to kill the SOB."
ś 62. Mitchell's statement to the police was essentially the same as the testimony given by Sistrunk. In the statement, Mitchell stated that Kristi asked her for a gun "to shoot a stray dog." Mitchell stated that Kristi had asked her this twice. Both times, Mitchell refused to allow Kristi to borrow a gun. There was no indication that Kristi had asked Mitchell to borrow a gun for any purpose other than to shoot a dog that was causing problems for Kristi.
ś 63. In its order denying Edmonds's motion for a new trial or directed verdict, the court stated that it would not grant a new trial to Edmonds on this issue, because "the jury did hear that Kristi Fulgham had attempted to get a gun from Toni Mitchell. . . . Vanessa Sistrunk testified that she was related to Miss Mitchell and that Kristi had tried to get a gun from Miss Mitchell and failed and that Kristi had tried to get a gun from Vanessa and failed."
ś 64. When reviewing a trial court's decision to admit or exclude certain evidence, we will reverse only if there is an abuse of the court's discretion: "the admissibility of evidence rests within the trial court's discretion." Davis v. State, 767 So.2d 986, 996 (ś 24) (Miss.2000) (quoting Hall v. State, 611 So.2d 915, 918 (Miss. 1992)).
ś 65. Edmonds urges us to find reversible error on this point because he alleges that the statement should have been admissible under Mississippi Rule of Evidence 804(b)(5), which states that the statement of an unavailable witness may be offered if the statement is evidence of a material fact, the interests of justice will be served by admitting the statement, and "the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts." As support, Edmonds cites Randall v. State, 806 So.2d 185 (Miss.2001), where the Mississippi Supreme Court reversed a conviction because the court had failed to admit the statement of an unavailable witness.
ś 66. In the case sub judice, we find that the statement was properly denied under Rule 804(b)(5). Since Sistrunk testified to virtually the same information as was contained in Mitchell's statement to the police, Mitchell's statement was not "more probative on the point" than Sistrunk's testimony at trial. Furthermore, the jury did hear that Kristi had asked *889 Mitchell for a gun; although there was an objection to Sistrunk's testimony about what Kristi had asked her grandmother, the court did not tell the jury to disregard the statement, but merely told Edmonds's attorney to be more careful with his questions. We find that the present case is distinguished from Randall by virtue of the fact that, in Randall, the excluded statement was the only evidence the defense could offer to support its theory. There was no repetitive testimony from a different witness, and the same testimony certainly was not offered in any form. That set of facts is completely different from the present case, where another witness testified both to the same fact and to the exact evidence that Edmonds wished to have introduced.
ś 67. After reviewing the record and the relevant case law, we find that the court did not abuse its discretion in refusing to admit Mitchell's statement. Therefore, we find no merit in this issue.
VI. Not Allowing Edmonds to Fully Present his Defense
ś 68. Under this assignment of error, Edmonds argues that the trial court erred in not allowing him to introduce allegedly crucial evidence which would have supported his defense. He contends that he did not kill Joey, and that it was more likely that Kristi, acting alone, killed Joey. As support for his contention, Edmonds sought to introduce evidence in the form of testimony from his father, Danny Edmonds, about statements allegedly made by Kristi and a videotape of a segment of the Montel Williams television show. According to Edmonds, his father's testimony and the videotape of the television show were key pieces of evidence that would have helped to reveal Kristi's desire and motive to kill Joey.
ś 69. Danny, who is also Kristi's father, gave a statement to the Oktibbeha County Sheriff's Department in which he stated that Kristi had asked him for a gun because she wanted Joey dead. In that statement, Danny said that Kristi had told him that she wanted Joey dead because he was mean to her and her kids, that she had made up her mind to do it, and that she would either shoot Joey in his car or while he was asleep.
ś 70. At trial, Danny was called as a witness by the defense; according to statements made to the court, he was to testify about the comments Kristi made to him about wanting Joey dead. Immediately prior to Danny's testimony, the prosecution entered a hearsay objection to his proposed testimony about statements Kristi made to him. The defense countered that the statements were a declaration against interest and were admissible under Mississippi Rule of Evidence 804(b)(3) and the United States Supreme Court's ruling in Chambers v. Mississippi, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973).
ś 71. There is no question that Kristi's statements to Danny, already recited in full, were hearsay; therefore, in order to be properly admitted, they would have to fall under one of the hearsay exceptions or within the parameters of Chambers, as Edmonds suggests.
ś 72. Mississippi Rule of Evidence 804(b)(3) states in pertinent part:
(b) Hearsay Exceptions. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:
(3) Statement Against Interest. A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject him to civil or criminal liability, or to render invalid a *890 claim by him against another, that a reasonable man in his position would not have made the statement unless he believed it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.
(emphasis added).
ś 73. In ruling on the unavailability of a witness under Rule 804(b)(3), the Mississippi Supreme Court has held that "[i]t is not enough to presume or [suspect] that someone will assert his Fifth Amendment privilege against self-incrimination and refuse to testify. They must be called to the stand and there refuse to testify before they become unavailable due to invoking the Fifth Amendment." Slater v. State, 731 So.2d 1115, 1118 (ś 9) (Miss.1999).
ś 74. Kristi's unavailability was never proven. The trial court specifically declined to rule on the admissibility of her statements to Danny until either side declared its intention to call Kristi to the stand. The record does not reflect that either side manifested an intention to call her to the stand after the court gave its ruling. Accordingly, we find that Kristi's statements to Danny do not fall within the hearsay exception of Rule 804(b)(3) because she was never legally unavailable.
ś 75. Even if we were to find that Kristi was unavailable as a witness, we are not convinced that the statements were against her penal interest at the time she allegedly made them. If Kristi had met with Danny after the murder and told him that she had killed Joey, then there would be no question that her statement would be against her penal interest. However, no matter how one reads Kristi's statements, that is clearly not what she said. Kristi merely told Danny that she wanted Joey dead, that she would tell Joey that she was broken down and when he came to assist her, she would shoot him, and that she would shoot him while he was asleep if the other method did not work. In essence, what Kristi did was tell Danny Edmonds about her desire to do an act in the future; she did not tell him that she had done the act. There is a significant difference between someone saying that she wants another person dead, or will kill the other person at some indefinite time in the future, and saying that she has killed the other person after the other person turns up dead. The former is an expression of the person's state of mind or intention to act, while the latter is an admission of guilt to a crime committed. One may always change her mind and not commit a contemplated criminal act. Nothing in Kristi's statement would have, at the time she made it, exposed her to criminal liability; therefore, it was not a statement against her penal interest. Based on her statement, she could not have been prosecuted for attempted murder, as she had not taken any overt act toward accomplishing the crime of murder.
ś 76. Moreover, there were no corroborating circumstances clearly indicative of the trustworthiness of Kristi's statement, as required by the rule. Even Danny said he did not believe what Kristi said because she is "a big liar and can tell convincing lies with a straight face." Further, there was nothing in the statement indicating that Kristi planned to act alone. Indeed, her statement that she "wanted Joey dead" is as much indicative of the fact that she might hire or convince someone to kill him as that she might do it herself. There is no evidence that Kristi ever called Joey and told him that she was broken down on the road. In her statement to Danny, she said that she would call Joey, tell him that she was broken down on the *891 road, and that when he came to see about her, she would shoot him. She said she would shoot him while he was asleep only if the first plan did not work. There was no corroborating evidence that the first plan did not work or that it was ever attempted.
ś 77. We next examine whether Kristi's statements to Danny fall within the court's holding in Chambers. Edmonds argues that even if the trial court disallowed the statements on the basis of hearsay, Green v. State, 442 U.S. 95, 99 S.Ct. 2150, 60 L.Ed.2d 738 (1979), and Chambers make it clear that under the due process clause, the hearsay rule cannot be used to preclude a criminal defendant from introducing the fact that another has admitted to the crime of which the defendant stands accused. Edmonds's own argument points out the key distinction between those cases and his own.
ś 78. In Chambers and in Green, the perpetrators made voluntary, spontaneous confessions to close friends that they had, in fact, killed the victims. Here, there is nothing in Kristi's statements to Danny to even remotely suggest that she was confessing to him that she had killed Joey. In Chambers, the Supreme Court was faced with the task of resolving whether the lower court erred in not allowing the hearsay statements pertaining to another man having confessed to committing the murder to which Chambers was charged with committing.[11] In resolving that issue, the court stated that "[t]he hearsay statements involved in this case were originally made and subsequently offered at trial under circumstances that provided considerable assurance of their reliability."[12]Chambers, 410 U.S. at 300, 93 S.Ct. 1038. The court noted that "each of McDonald's confessions was made spontaneously to a close acquaintance shortly after the murder had occurred." Id. Here, we do not having Kristi confessing to Danny that she killed Joey shortly after the murder had occurred. We only have Kristi's statement, before the murder, that she wanted Joey dead. The Chambers court also noted that "each one [the confessions] was corroborated by some other evidence in the case." Id. Here, the only corroboration that we have is that Joey was shot while he slept. However, shooting him in his sleep was not supposed to happen unless shooting him on the road did not work. As we have already stated, there is no evidence that an attempt was made on Joey's life by Kristi or anyone else claiming to be broken down on a road. The Chambers court further noted that "each confession here was in a *892 very real sense self-incriminatory and unquestionably against interest." In the case before us, we find Kristi's statements, at most, are only borderline self-incriminatory because no criminal act had occurred when the statements were made. Also, as previously stated in this opinion, we do not find the statements to be against Kristi's penal interest. Therefore, unlike the court in Chambers, we do not find that "[t]he testimony rejected by the trial court bore persuasive assurances of trustworthiness and thus was well within the basic rationale of the exception for declarations against interest." Id. at 302, 93 S.Ct. 1038.
ś 79. For the sake of thoroughness, we very briefly address the issue of the trial court's refusal to admit a videotape of a segment of the Montel Williams television show. Edmonds contends that the videotape was key in demonstrating the tumultuous nature of Kristi and Joey's relationship. Edmonds argues that the videotape was further proof that Kristi had the desire and motive to kill Joey. In refusing to admit the videotape, the trial court properly conducted a Mississippi Rule of Evidence 403 analysis. The court found that the videotape was unduly prejudicial and that any probative value was outweighed by the potential to confuse the issues or mislead the jury. We agree. Furthermore, since the particular episode of the show aired in September 2000, we fail to find that it had significant probative value two and a half years later. Therefore, we cannot find that the trial court abused its discretion in refusing to admit the videotape. This issue is without merit.
VII. The Trial Court's Exclusion of Potential Jurors for Cause
ś 80. Edmonds argues that the trial court erred in excluding four jurors because the court believed that the potential jurors would consider his age. A review of the record reveals that each of the potential jurors in question expressed concerns about Edmonds's age in one form or another.
ś 81. Edmonds first argues that the trial court wrongly excluded Rhonda Harris. The following conversation transpired between Ms. Harris and the court:
BY THE COURT: Ms. Harris, I'm going to ask you the same question. Would the fact that Mr. Edmonds is 15 years old affect your ability to fairly listen to this case and decide the case on the evidence presented?
A. It would, Judge. I have a nephew about his age.
BY THE COURT: You could not?
A. No, I couldn't.
BY THE COURT: Because of the age?
A. Yeah.
BY THE COURT: You could not listen to the evidence and return a true verdict, whether it was favorable to him or unfavorable to him, based upon his age?
A. I just couldn't.
ś 82. Edmonds next argues that Joe Farris was wrongly excluded by the court. The record reflects that Farris had a somewhat lengthy conversation with the court in which he clearly expressed his concerns with Edmonds's age. The relevant portion of Farris conversation with the court was as follows:
BY THE COURT: Yes, Sir.
A. I [Joe Farris] have serious reservations about the age of the defendant.
BY MS. FAVER: I'm sorry, sir. I didn't hear.
BY THE COURT: He has serious reservations about the age of the defendant.
*893 ś 83. Edmonds goes on to argue that the trial court erroneously excluded Carole Doughty. The record reflects that the following colloquy occurred between the prosecution and Doughty:
BY MS. FAVER: With everything you [Doughty] just said, is that going to affect your ability to be fair in this case?
A. Well, I will try to be just and fair and I will try to be fair, but still I think it's hard because of his immaturity and lack of knowledge in his heart.
BY MS. FAVER: So it would affect your ability?
A. Yes, I guess so.
ś 84. Finally, Edmonds contends that the trial court erred in excluding R.W. Tutton. Tutton engaged in the following conversation with the court:
A. The only problem I [Tutton] had is if you say I'm going to prove that he did something without any consideration but this one day. If he snapped and did something just like that and I would have to answer to why he did it or what happened if it did come to that.
BY THE COURT: Now let me ask you this. If the State's evidence was such that at the end of the case, after you have heard everything and all the law, that the evidence was such that you were convinced beyond a reasonable doubt of this defendant's guilt of some crime that you're instructed on, could you return a guilty verdict if the State met its burden of proof and convinced you of his guilt beyond a reasonable doubt?
A. Well, I could if he convinced me that he would did [sic] something. I just have no reasoning like that. I mean, it would be hard for me to just say if you say when you come to court and say I'm depending on what he did this day, this day, this hour at that time, and no more. If they could prove that he did do it this day at that hour, then I would still be kind of thinking why he did it and along that part.
ś 85. After individual questioning, the trial court properly concluded that each potential juror would be somehow influenced by Edmonds's age and could not be totally impartial. Mississippi Code Annotated section 13-5-79 (Rev. 2002) provides in pertinent part that "[a]ny juror shall be excluded . . . if the court be of opinion that he cannot try the case impartially, and the exclusion shall not be assignable for error." See Coverson v. State, 617 So.2d 642, 646 (Miss.1993). "In short, the important and long established maxim has been: (1) that a defendant has no right to have specific prospective jurors try his or her case, and (2) that a defendant cannot complain on appeal of a particular exclusion if the end result was a jury composed of fair and impartial jurors." Id. (citing Sherman v. State, 234 Miss. 775, 780, 108 So.2d 205, 207 (1959)). Findings of the trial court on the impartiality of jurors are given deference because the trial judge is in a better position to evaluate responses. Davis v. State, 660 So.2d 1228, 1244 (Miss.1995) (citations omitted). Therefore, we find that the trial court did not abuse its discretion in excluding these potential jurors.
VIII. Sentence Instruction
ś 86. In this issue, Edmonds claims that the trial court erred in refusing to inform the jury of the possible life sentence he would receive if convicted. The core of Edmonds's argument is that he believes that the jurors might have been misled into believing that, due to his age, he could receive a sentence less than life.
*894 ś 87. During voir dire, the court questioned jurors as to any potential problems they would have because of Edmonds's young age. One juror raised her hand and asked to approach the bench, where she indicated that she would have a problem with "capital punishment." At that point, The trial judge asked her if she understood "this is not a case where the death penalty could be imposed?" The trial judge went on to inform the juror that Edmonds "is not old enough by law to receive the death penalty. Do you understand that? This is not a death penalty case." The juror then indicated that she would not have a problem because of Edmonds's age. After the juror returned to her seat, the court addressed the entire venire: "Does everybody understand even though this charge is capital murder, this is not a case where a death sentence could be returned? . . . You're not being asked to decide whether a death penalty is appropriate in this case."
ś 88. Under current Mississippi law, it is improper to argue the sentence that a defendant might receive before a jury. In Thomas v. State, 818 So.2d 335, 348 (ś 43) (Miss.2002), the Mississippi Supreme Court held that there was no error on the part of a court for refusing to inform a jury of the mandatory life sentence that the defendant would receive if convicted. In Marks v. State, 532 So.2d 976, 983 (Miss.1988) (citations omitted), the Mississippi Supreme Court stated: "We have consistently disapproved of arguments which refer to the potential sentence in a given case."
ś 89. The reason for disallowing such comments about potential sentences is clear: "The problem with arguments such as these is that they invite the jury to convict with regard to the punishment, not with regard to the evidence before them, and the jury should have no concern with the quantum of punishment to be imposed." Id. (citing Abney v. State, 123 Miss. 546, 550, 86 So. 341, 341 (1920)). In the present case, it is difficult to see the purpose in informing the jury that Edmonds could receive a life sentence other than to encourage jury nullification. Since the jury could not determine any part of sentencing, informing them of sentencing would have had no effect other than to create sympathy for Edmonds.
ś 90. Under the facts of this case, it would have been improper for the court to have allowed Edmonds's attorneys to inform the jury that Edmonds would receive a mandatory life sentence if convicted of murder. The only purpose of such a comment would have been to incite the passions of the jury and encourage jury nullification. Under Mississippi law, such remarks have been held to be improper and inadmissible. Therefore, the court did not abuse its discretion in not allowing Edmonds to inform the jury that he could receive a mandatory life sentence if convicted.
IX. Transfer to Youth Court
ś 91. In this assertion of error, Edmonds asserts that the court erred in refusing to transfer his case to youth court.
ś 92. Mississippi Code Annotated section 43-21-151(1) (Rev.2004), dictates that capital murder crimes come under the original jurisdiction of the circuit court. Therefore, the Oktibbeha County Circuit Court had original jurisdiction over Edmonds's case. The Mississippi Code does allow the transfer of such cases to youth court, under section 43-21-159(4), but such transfer is optional and is at the circuit court's discretion. Section 43-21-159(4) provides that "the circuit judge, upon a finding that it would be in the best interest of such child and in the interest of justice, *895 may . . . transfer such proceedings to the youth court. . . ."
ś 93. In the present case, the trial judge performed an extensive analysis of what would be in both Edmonds's best interest, and the best interest of justice. After having done so, the trial judge found that the interests of justice necessitated that the case stay within the jurisdiction of the circuit court, rather than youth court.
ś 94. Having reviewed the record and relevant law, we find that the trial judge did not abuse his discretion when he declined to transfer this case to youth court.
X. Automatic Life Sentence
ś 95. Edmonds alleges that the automatic life sentence imposed upon him is unconstitutional, because it does not allow the trial court any discretion to take into account his particular circumstances. Edmonds maintains that he did not have the opportunity to present mitigating factors because the court held that there was but one sentence that Edmonds could receive under Mississippi Code Annotated section 97-3-21, which states: "Every person who shall be convicted of murder shall be sentenced by the court to imprisonment for life in the State Penitentiary." This statute carries a mandatory sentence of life imprisonment and allows the trial court no discretion once a conviction for murder has been returned.
ś 96. In Mississippi, sentences which are within the statutory range are generally considered to be constitutional and are upheld. Tate v. State, 912 So.2d 919, 933 (ś 48) (Miss.2005) (quoting Stromas v. State, 618 So.2d 116, 123-24 (Miss. 1993)). Additionally, the United States Supreme Court held in Chapman v. United States, 500 U.S. 453, 466-67, 111 S.Ct. 1919, 114 L.Ed.2d 524 (1991), that a sentence does not need to take into account "individual degrees of culpability" to be constitutional, and Congress may "define criminal punishments without giving the courts any sentencing discretion."
ś 97. The Mississippi legislature has explicitly legislated that convictions for murder are intended to carry life sentences. No exception is named in the statute for a defendant of tender years. The fact that the legislature has specifically written the code so as to expose a minor to prosecution in the circuit court as an adult indicates that juveniles prosecuted for grievous offenses, such as the one here, are intended to be tried and sentenced like an adult. The special exceptions and protections rendered to defendants of tender years are reserved for juveniles prosecuted in youth court.
ś 98. Therefore, despite the fact that no discretion is given the trial court by the statute, Edmonds's sentence is still constitutional, and the court did not err in sentencing Edmonds to life. Indeed, any other sentence would have constituted error on the part of the court, since it had no discretion to impose a different sentence.
XI. Cautionary Instruction
ś 99. In his eleventh issue, Edmonds claims that the trial court erred in refusing to grant a proposed jury instruction that confessions by juveniles should be considered with caution. Edmonds argues that, just as a court should instruct the jury to regard the testimony of co-conspirators with caution, so should the jury be given an instruction regarding the alleged unreliability of a juvenile's confession.
ś 100. Edmonds's proposed instruction on the matter, D-2(A), reads:
The Court instructs the jury that the United States Supreme Court has stated as follows, "Authoritative opinion has cast formidable doubt upon the reliability and trustworthiness of confessions by *896 children." I charge you that since the United States Supreme Court has said there is "formidable doubt upon the reliability and the trustworthiness of confessions by children," you should view the confession of Tyler with caution.
ś 101. The passage quoted in the proposed instruction comes from In re Gault, 387 U.S. 1, 52, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967). However, the Gault court acknowledged that the confessions of juveniles should be viewed with extra caution under certain circumstances: "If counsel was not present for some permissible reason when an admission was obtained, the greatest care must be taken to assure that the admission was voluntary, in the sense not only that it was not coerced or suggested, but also that it was not the product of ignorance of rights or of adolescent fantasy, fright or despair." Gault, 387 U.S. at 55, 87 S.Ct. 1428.
ś 102. Essentially, most of the discussion in Gault is concerned with the voluntariness of a juvenile's confession, an issue we have already discussed. In the present case, although Edmonds did not have counsel present while he gave his confession, we have held that the confession was voluntary in every respect. Edmonds had already signed his Miranda waiver, and confessed to murdering Fulgham both in and out of the presence of his mother. No mention is made in Gault of whether a jury should be instructed to view the testimony of such a juvenile with particular caution.
ś 103. However, the Mississippi Supreme Court has held that it is not reversible error for a court to refuse to give an instruction cautioning a jury that it must regard the testimony of a juvenile with particular caution. Bandy v. State, 495 So.2d 486, 493 (Miss.1986) (overruled on other grounds). In Bandy, the court stated:
The instruction is given in those cases [involving testimony of accomplices and co-defendants] because of the inherent mistrust of those witnesses' veracity. That is not necessarily the case with a child witness. In that case, it is not presumed that the child may be dishonest, but simply that he or she may not have the capacity to understand sufficiently or remember correctly the events to which he or she is testifying. A child's testimony should not be viewed with a jaundiced eye as to whether or not the child is truthful â a child may be presumed to be as truthful as any other witness. If the jury is to be instructed at all with respect to the testimony of a child, it should be told to view the testimony in the light of the child's age and understanding, not his veracity.

(emphasis added). Edmonds counters: "In Bandy, the Court was not confronted with the same argument as here, which is that the United States Supreme Court's decision in [Gault] held that `authoritative opinion has cast formidable doubt upon the reliability and trustworthiness of "confessions" by children.'" However, as already explained, we find that the factual circumstances surrounding this case are significantly different from the facts in Gault and the other cases discussed therein.
ś 104. In the present case, we believe that the jury was adequately instructed regarding the credibility with which it should view Edmonds's confession. The Mississippi Supreme Court has clearly explained why a juvenile's testimony is not to be viewed with the same suspicion and precautions as a co-defendant or accomplice. Although the present case concerns a confession by a juvenile, and not mere testimony, we believe that the reasoning of the court applies and supports our determination that juvenile confessions do not *897 require a cautionary instruction. As discussed previously, the Mississippi legislature has chosen to treat juveniles as adults by subjecting them to prosecution in the circuit court for certain crimes. Given that clear legislative intent, we decline to offer juveniles prosecuted as adults the additional precaution of an instruction urging the jury to treat the juvenile specially simply because he is a juvenile. The court did not err in refusing the proposed instruction.
XII. Recantation Testimony
ś 105. In this issue, Edmonds claims that it was error on the part of the court to refuse "to allow the defense to produce evidence that Tyler had retracted his confession." As an example of the harm caused by this "error," Edmonds's brief explains: "Under the trial court's ruling, Tyler could not tell the jury in opening statement about the retraction, and could not prove the fact that he had given the retraction by questioning Sheriff Bryan about it or testifying about it in his direct testimony." Edmonds claims that the trial judge refused to allow him to present this evidence, "ruling that it is `hearsay.'"
ś 106. The only passage that Edmonds points to in the record regarding the court's ruling is the following exchange (Edmonds's attorney is arguing for the admission of Mitchell's statement, the witness who died before trial. The exclusion of her statement was discussed in issue V):
[Edmonds's Attorney]: â Yes, sir. The statements that Ms. Mitchell made about what she was told are not being offered â the statements that the other person made to Ms. Mitchell are not being offered for the truth of the matter asserted and that's why they're not hearsay.
[Court]: What are they offered for?
[Edmonds's Attorney]: They're offered to corroborate the defendant's second videotaped statement [the recantation].
[Court]: So you anticipate putting the defendant on the stand then because I don't see how the second videotaped statement comes in unless he takes the stand and is impeached?

[Edmonds's Attorney]: I think it is certainly possible that we're going to put him on the stand. I think we do have â I'm not prepared to make it today, but I think we have an argument that it is also admissible even if he doesn't, but this statement would be to corroborate that.
[Court]: Well, then isn't that going to depend â my ruling on this one then is going to depend on one, if he takes the stand, or two, you can find some exception to put the May 16th, 2003 videotape into evidence. Is that correct?
[Edmonds's Attorney]: I think that is probably correct, your Honor. I mean, I've really not thought it through completely. There may be another way that this comes in, but I'm happy if the Court wants to withhold ruling and we will address it later.
* * *
[Court]: Mr. McDuff argues that it is corroborative of a May 16, 2003 second videotaped statement. . . . At this point, I'm going to withhold ruling on it because I think it would be speculative at this point to rule one way or the other. If he takes the stand and he is substantially impeached, then Randall versus State may dictate one result. If he does not take the stand and the second videotape does not come in, then this statement would not come in.
(emphasis added). This exchange clearly establishes several points. First, the court is discussing the admission of the videotape. *898 Nothing in the exchange above indicates that Edmonds would not be able to mention the recantation or cross-examine witnesses about its existence. Second, the court did not even rule on the admission of the recantation videotape. Even if the above exchange could somehow be taken as discussing not only the videotape, but also any mention of the recantation, the court clearly withheld its ruling. In fact, Edmonds's attorney indicated that he would present additional arguments to the court regarding why the videotape could come in.
ś 107. It is apparent from the record that Edmonds's attorneys believed that they could not mention the recantation during the proceedings below. No mention of the recantation was made during Edmonds's opening statement or during the direct examination of Edmonds. Not until the State's cross-examination of Edmonds did the recantation surface. However, whatever misapprehension Edmonds's attorneys labored under, nothing in the exchange cited prevented them from mentioning their client's recantation. Additionally, Edmonds testified to the substance of his recantation on direct examination, and the jury was eventually told that he had recanted his videotaped confession.
ś 108. Since the court never ruled on the admission of the videotape, nor forbade mention of the recantation, this suggestion of error is clearly without merit.
XIII. Closing the Suppression Hearing
ś 109. Edmonds argues that the trial court erred in excluding the press and the public from his suppression hearing. The trial court made its decision to close the suppression hearing after receiving testimony from all parties potentially affected by its proposed ruling. Specifically, the court allowed Edmonds's attorney, Kristi's attorney, and the prosecution to present their arguments and viewpoints on the matter. The court also examined a copy of a press release pertaining to the case, which apparently originated from Edmonds's attorney's office. The court also listened to and viewed television and newspaper comments made about the case by Edmonds's attorney. Finally, the court even heard testimony from journalists about statements made by Edmonds's attorney concerning the case.
ś 110. The trial court based its decision to close the suppression hearing on the United States Supreme Court holding in Waller v. Georgia, 467 U.S. 39, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984). In Waller, the court stated that "the party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced, the closure must be no broader than necessary to protect that interest, the trial court must consider reasonable alternatives to closing the proceeding, and it must make findings adequate to support the closing." Id. at 48, 104 S.Ct. 2210.
ś 111. In making its ruling, the trial court stated the following:
We have gone over this matter in chambers, on the record in chambers, and the Court has considered a number of cases. One was Waller versus Georgia. It's a United States Supreme Court case that dictates what the Court believes it must do in a case like this where you've got two co-defendants that are not being jointly tried. Accordingly, the Court finds that there is an overriding substantial probability that if the hearing is open that one of the parties, that being Ms. Kristi Fulgham's right to a fair trial will be adversely affected. Ms. Fulgham has not made any public statements. There's nothing in the press attributed to her or her attorney. She *899 has not moved for a change of venue from this county, and under the Constitution of the United States, she is entitled to a fair trial by an impartial jury and that is one that has not heard matters that have been attributed to her that have not been filtered through the rules of evidence by this Court. We went through various means to try to tailor it down to be able to keep everybody in the courtroom and Ms. Fulgham's attorney expressed some concerns that even what we thought were probably the most narrowly tailored would still harm her client. The Court reluctantly concurs that to tailor it in such a way that would be narrow enough would tie Mr. Edmonds attorney's hands in trying to prosecute this motion and the State's hands in trying to prosecute this fully and fairly and I'm not going to require that. Therefore, the suppression hearing will be closed. . . .
ś 112. We agree with the court's ruling. Therefore, we find that the only viable option left to the court was to close the suppression hearing to the press and public in order to prevent any further pre-trial publicity and to protect Kristi's constitutional right to a fair and impartial trial.
ś 113. Furthermore, according to the Rules for Electronic and Photographic Coverage of Judicial Proceedings, electronic coverage of matters such as suppression hearings are left to the judge's discretion. Rule 3(c) of Mississippi Rules for Electronic and Photographic Coverage of Judicial Proceedings provides in pertinent part that "[e]lectronic coverage of the following matters is expressly prohibited unless the presiding justice or judge shall allow the coverage by order. . . . motions to suppress evidence. . . ."
ś 114. Edmonds cites In re WLBT, Inc., 905 So.2d 1196 (Miss.2005), for the proposition that in deciding to close a judicial proceeding, the primary rights to be considered are those of the accused, not the rights of another defendant who may stand trial in the future. In WLBT, our supreme court held that WLBT should be allowed to provide television coverage of the accused's sentencing hearing in accordance with the Mississippi Rules for Electronic and Photographic Coverage of Judicial Proceedings. However, that case involved the press's coverage of a sentencing hearing. Here, we have a party arguing that the press should have been allowed to cover a suppression hearing, which is a matter that may be prohibited from coverage under Rule 3(c).
ś 115. Given the facts and circumstances of this case, we do not find that the trial court abused its discretion in closing the suppression hearing to the press and the public.
XIV. Cumulative Error
ś 116. In his final assertion of error, Edmonds claims that cumulative errors denied him his right to a fair trial.
ś 117. At the outset, we note that "the Constitution does not guarantee a perfect trial, but it does entitle a defendant in a criminal case to a fair trial." Clark v. State, 891 So.2d 136, 140-41 (ś 19) (Miss.2004) (citing Delaware v. Van Arsdall, 475 U.S. 673, 681, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986)). Therefore, a trial need not be perfect in order to be valid; some aspects of the proceeding may rise to the level of harmless error without requiring reversal of the case. However, under the doctrine of cumulative error, it is possible for those harmless errors to cumulatively require reversal of a case.
ś 118. The Mississippi Supreme Court has held that "upon appellate review of cases in which we find harmless error or any error which is not specifically found to *900 be reversible in and of itself, we shall have the discretion to determine, on a case-by-case basis, as to whether such error or errors, although not reversible when standing alone, may when considered cumulatively require reversal because of the resulting cumulative prejudicial effect." Glasper v. State, 914 So.2d 708, 729 (ś 46) (Miss.2005) (quoting Byrom v. State, 863 So.2d 836, 847 (ś 13) (Miss.2003)).
ś 119. After reviewing the record and above issues, we conclude that, not only was there no reversible error in Edmonds's trial, but also there was no harmless error. Since we have found no error whatsoever in the proceedings below, we do not find that any cumulative errors exist.
ś 120. For the reasons presented, we affirm the decision of the trial judge on each issue presented. Admittedly, this was a difficult case because of the age of the defendant and the punishment required by law; nevertheless, we as judges are duty bound to follow the law, as was done by the trial judge in this case.
ś 121. THE JUDGMENT OF THE OKTIBBEHA COUNTY CIRCUIT COURT OF CONVICTION OF MURDER AND SENTENCE OF LIFE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
MYERS, P.J., GRIFFIS AND ROBERTS, JJ., CONCUR. LEE, P.J., SPECIALLY CONCURS WITH SEPARATE WRITTEN OPINION, JOINED BY GRIFFIS, ISHEE AND ROBERTS, JJ. BARNES, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION, JOINED BY KING, C.J. SOUTHWICK AND CHANDLER, JJ., NOT PARTICIPATING.
LEE, P.J., Specially Concurring:
ś 122. With a heavy heart I regrettably concur in the result reached by the majority in this instance. Undoubtedly, the laws in this State leave little room for juvenile offenders such as Tyler. I do not argue that the legislature acted outside its authority in creating a bright-line rule that mandates the circuit court's original jurisdiction over offenders such as Tyler. However, prudence may dictate reevaluating the law on this issue.
ś 123. Mississippi Code Annotated Section 43-21-1519(1)(a) (Rev.2004) provides, "[a]ny act attempted or committed by a child, which if committed by an adult would be punishable under state or federal law by life imprisonment or death, will be in the original jurisdiction of the circuit court[.]". While it is clear that the circuit court has original jurisdiction over this case, I question the wisdom and justice in such a rule and the paradox it presents. Because Tyler was accused of murder he was not entitled to the presence of his parent, guardian or custodian while the officers interrogated him. Paradoxically, if Tyler had been questioned because of a minor offense, such as the misdemeanor charge of shearing wool from a dead sheep, or the felony charge of automobile burglary, Tyler would have been entitled to the presence of a parent during the questioning. See, e.g. M.A.C. v. Harrison County Family Court, 566 So.2d 472, 475 (Miss.1990).
ś 124. Historically, the judiciary and the legislature have addressed the rights of minors and the need to afford them extra protection, as evidenced by the Youth Court Act, child support enforcement provisions, and laws regarding statutory rape. Tyler lacks the capacity to *901 vote, drive, get married, enter into a contract or even drop out of school; however, because he is faced with such a grievous charge, he is automatically not afforded the protections of the Youth Court Act.
ś 125. I am also concerned with the severity of Tyler's sentence. Because of his age, he has essentially received a sentence of death. Mississippi Code Annotated Section 97-3-21 (Rev.2000) mandates a life sentence upon conviction of murder; however, this provision offers the circuit court no discretion in sentencing a youthful offender such as Tyler. I am not unmindful that the constitutional standards for sentencing are not absolute and are subject to an evolutionary standard. Recall that in its last session, the Supreme Court determined that the death penalty for persons under age eighteen at the time they committed the crime was unconstitutional. Roper v. Simmons, 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005). This is a clear deviation from the prior, plurality decision that the death penalty could not apply to persons under age sixteen at the time they committed the crime. Thompson v. Oklahoma, 487 U.S. 815, 108 S.Ct. 2687, 101 L.Ed.2d 702 (1988). Although this change is encouraging, without a change in our laws, this shift in the constitutional standard offers little consolation to Tyler and other youthful offenders similarly situated.
GRIFFIS, ISHEE AND ROBERTS, JJ., JOIN THIS OPINION.
BARNES, J., Concurring in Part, Dissenting in Part:
ś 126. I respectfully dissent as to issue 3. I would find reversible error in allowing Dr. Hayne to testify that two people were involved in firing the murder weapon, thereby bolstering the State's case against Tyler Edmonds.
ś 127. Dr. Hayne, after viewing the videotaped confession given by Edmonds, was asked whether he had "an opinion as to whether or not the defendant's version of the events is consistent with what [he] found in Mr. Fulgham." Defense counsel made a specific objection that this proposed testimony was "totally outside of anything in his report and also outside of anybody's expertise, and under Daubert [v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)], he would have to show some basis for some expert opinion of anything like that."
ś 128. In marked contrast to the full day spent analyzing the defense's proposed expert testimony as to false confessions, and authoring a detailed opinion excluding that testimony, the trial court failed to conduct any kind of Daubert analysis as to Dr. Hayne's proposed bolstering testimony. While I commend the trial court for its analysis and attention to detail in the first instance, I fault the court for failing to conduct a similar analysis with respect to Dr. Hayne's proposed testimony. I find that the trial court erred in allowing Dr. Hayne to testify beyond the scope of his expertise and the scope of Daubert in this regard. It is my opinion that the trial court thereby allowed the improper bolstering of Edmonds's videotaped "version" of the shooting, thus discrediting the recanted testimony of Edmonds. As pointed out by the majority opinion, Edmonds's "version" of events, which included the location of his and Kristi's hands during the shooting, changed during the course of his videotaped confession. This being the case, I believe that a Daubert analysis was especially important to determine which "version" of the events Dr. Hayne was being asked to confirm. Such an analysis would have identified the extent of Dr. Hayne's proposed testimony.
*902 ś 129. In the majority opinion, the defense, not the State, is credited with asking the question regarding the two-person theory. However, the defense was left with no other option after the court entered its ruling that Dr. Hayne could testify in support of the videotaped confession: it ruled, "I will allow the question to be asked. You can certainly cross-examine him on the basis for that statement on cross." Thereafter, the State asked Dr. Hayne:
Doctor, I had asked you regarding your examination of the victim, Joseph Fulgham, your examination of the photographs, the crime scene video, the location that Mr. Fulgham was found, and this defendant's version of what happened and how he was killed, based on a medical degree of certainty or within a medical degree of certainty, do you have an opinion one way or another whether or not that is consistent?
Having responded in the affirmative, Dr. Hayne then testified, "Within a reasonable medical certainty, it's consistent with the scenario provided to me and would be in compliance with the facts that I saw." I fail to see how this testimony can be viewed as anything less than a wholesale assurance by Dr. Hayne that everything in Edmonds's "version of what happened" was proved to a reasonable degree of medical certainty. This being the case, the defense had no alternative but to cross-examine Dr. Hayne as to the specifics of Edmonds's "version" of events in order to determine the basis for Dr. Hayne's conclusion that this version was accurate.
ś 130. In response to the defense's call for a Daubert analysis to determine whether there is "some scientific study on this area as to whether a pathologist has some expertise in saying that a version where two people hold a gun and shoot somebody sleeping is consistent with the manner of death, some scientific basis" (emphasis added), the State made no denial that its intent was for Dr. Hayne to bolster the two-person theory. Instead, the State merely responded that Dr. Hayne was "not just a pathologist. He's a forensic pathologist. There is a distinction."
ś 131. In its opening statement, the State informed the jurors that, "You are going to hear how this defendant leaned over Joey while he was asleep and pointed the gun at the back of his head. You're going to hear how Kristi stood behind him and held him and you're going to hear how they both put their finger on the trigger and you're going to hear how they both shot and killed Joey Fulgham" (emphasis added). As the majority opinion points out, "Edmonds â despite saying at one point that Kristi's hand was on the trigger â made it clear during further questioning that he was unsure of the location of either of Kristi's hands when the fatal shot was fired. . . ." Only by introducing the testimony of Dr. Hayne was the State able to make good on its promise that it would produce "evidence" of the two-person theory. Accordingly, I believe that the direct examination of Dr. Hayne implicitly bolstered the two-person theory and should have been examined under Daubert.
ś 132. In denying the defense objection at trial, the court agreed with the State that there is a distinction for forensic pathologists, citing Holland v. State, 705 So.2d 307 (Miss.1997). In denying the motion for new trial, the court, in addition to Holland, also cited McGowen v. State, 859 So.2d 320 (Miss.2003). In McGowen, the supreme court found that a forensic pathologist may render an expert opinion at trial as to whether a particular instrument or weapon in evidence was consistent with particular injuries to a victim. McGowen, 859 So.2d at 334-36 (śś 47-57). Similarly, *903 in Holland, the court found that a forensic pathologist could testify that a particular instrument was consistent with the victim's injuries. Neither of these cases stands for the proposition that a forensic pathologist is competent to testify as to the number of people who were pulling the trigger on a gun. Neither case stands for the proposition that a forensic pathologist's opinions are totally exempt from any analysis under Daubert or the rules of evidence.
ś 133. As stated in Mississippi Transp. Comm'n v. McLemore, 863 So.2d 31, 36 (ś 11) (Miss.2003), "The party offering the expert's testimony must show that the expert based his testimony on the methods and procedures of science, not just his speculative beliefs or unsupported speculation." It was in McLemore that the Mississippi Supreme Court adopted a modified Daubert standard for the admission of expert evidence. See id. at (ś 23). In this case, the court was charged with the responsibility under Daubert and McLemore to determine whether the evidence was reliable and admissible. See McLemore, 863 So.2d at 38 (ś 16). I believe that the direct examination of Dr. Hayne verifying Edmonds's "version" of the shooting to a reasonable degree of medical certainty should have been subject to Daubert scrutiny. Because the court failed to do so, the proper remedy would be to remand for a new trial.
KING, C.J., JOINS THIS OPINION.
NOTES
[1] Actually, Edmonds was one month away from his fourteenth birthday, and at the time of his conviction in July 2004, he was fifteen years old.
[2] The proper spelling of the name is "Kristi." We have chosen to leave the spelling as it is in the transcript of the videotaped interview. However, in other portions of the opinion, we use "Kristi."
[3] Edmonds's first statement was a complete denial of having any knowledge of Joey's murder. This statement was not videotaped.
[4] Although Daubert explicitly applied itself only to cases involving scientific expert testimony, the reasoning of the case was later extended to all other types of experts (including psychologists) by Kumho Tire Co. v. Carmichael, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).
[5] The McLemore court adopted both Daubert and Kumho Tire's extension of Daubert to all expert witnesses.
[6] Dr. Redlich had conducted an experiment where student participants were all given a document to type. All of the students were told not to hit the "Alt" key on their keyboard, because hitting the key would destroy or damage the computer system. At some point, the document would crash, and the student would then be rigorously questioned as to why they hit the "Alt" key â when, in fact, none of the students had hit the key. When accused of hitting the key, Dr. Redlich found that a significant percentage of the students falsely confessed to having done so.
[7] The court held that Dr. Redlich had "admitted that it is not scientifically proven that younger suspects are more likely to give false confessions than older suspects." Edmonds attacks this statement in the court's order as refuted by a study presented the court by Redlich, where researchers had examined cases where they believed that someone who gave a false confession was later shown to be innocent. However, the record also indicates that there is some dispute as to the validity of the methodology used in the study cited by Redlich. After reviewing the record, we cannot say that the court "ignored" the study in finding that false confession expert testimony is unreliable under Daubert.
[8] The major proponents of the theory of false confession are Allison Redlich, Richard Leo, Richard Ofshe, Dr. Gisli Gudjonsson, Dr. Jon Sigurdsson, and Dr. Saul Kassin. The two in opposition are Dr. Michael Welner and Paul G. Cassell. An amicus brief filed with this Court suggests that the number of experts in the field is actually at least sixty individuals. However, there is no indication that this number, or even the existence of these experts, was presented to the trial court. Therefore, these figures cannot be taken into account when addressing whether the court erred in not admitting Dr. Redlich's testimony.
[9] See Adams, 271 F.3d at 1244-46; Tellier, 526 A.2d at 943-45; Ritt, 599 N.W.2d at 810-12; Davis, 32 S.W.3d at 607-09.
[10] In his initial confession, Edmonds stated that Kristi had asked him for a gun to shoot Joey Fulgham.
[11] In Chambers, Chambers was charged with murdering a policeman. Chambers proclaimed his innocence, and another man, Gable McDonald, came forward and confessed to having killed the policeman. However, McDonald later repudiated his prior sworn confession. At trial, Chambers tried to introduce the testimony of three of McDonald's friends; each was scheduled to testify that Chambers had told them that he had killed the policeman. Nevertheless, the lower court ruled that their testimony was inadmissible hearsay.
[12] In Green v. State, 442 U.S. 95, 99 S.Ct. 2150, 60 L.Ed.2d 738 (1979), the Supreme Court was faced with a similar set of circumstances as in Chambers. In that case, Green and Carzell Moore were indicted together for the rape and murder of a woman. At trial, Green tried to introduce the testimony of a witness who claimed that Moore had told him that he actually killed the woman. The court refused to allow the testimony, ruling that it was hearsay. In reversing the lower court, the Supreme Court stated that "substantial reasons existed to assume its [the excluded testimony] reliability. . . . Moore made his statement spontaneously to a close friend. The evidence corroborating the confession was ample. . . . The statement was against interest, and there was no reason to believe that Moore had any ulterior motive in making it." See Green, 442 U.S. at 97, 99 S.Ct. 2150.